UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE HEITING, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br>vs.<br><br>KORANGY PUBLISHING INC., a New York corporation; and DOES 1 through 25, inclusive,<br><br>    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. **VIOLATIONS OF THE CALIFORNIA TRAP AND TRACE LAW (CAL. PENAL CODE § 638.51)** |

## INTRODUCTION

1. Defendant KORANGY PUBLISHING INC. ("Defendant" or "Korangy") uses data broker software on its website – https://therealdeal.com/ (the "Website") – to secretly collect data about a Website visitor's computer, location, and browsing habits. The data broker software then compiles this data and correlates that data with extensive external records it already has about most Californians in order to learn the identity of the Website user.

2. Defendant's installation and use of data broker software without obtaining consent is a violation of the California Trap and Trace Law, California Penal Code sections 638.50 and 638.51.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

1

4. This Court has general jurisdiction over Defendant Korangy because it is a New York corporation with its headquarters located in New York, New York.

5. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because Defendant resides in the District, where its headquarters are located.

**PARTIES**

6. Plaintiff Jane Heiting ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of California residing and located within the Central District of California. Plaintiff maintains reasonable expectations of privacy when browsing websites. Defendant systematically violated these expectations through its unauthorized surveillance activities.

7. Defendant Korangy owns and operates https://therealdeal.com/ (the "Website"). The Website offers to the public news, market intelligence, data, and analysis on commercial and residential real estate concerning major US metropolitan areas including New York City, Los Angeles, Chicago, San Francisco and South Florida.

8. Plaintiff identifies DOE Defendants 1 through 15 as unknown entities that Defendant directed and controlled to participate in implementing or maintaining Defendant's system. Plaintiff will seek leave to amend this Complaint to identify these entities when Defendant's discovery responses reveal their true names and roles.

9. Each DOE Defendant acted as Defendant's agent or employee in Defendant's implementation of the surveillance scheme described herein. Each DOE Defendant operated within the scope of its relationship with Defendant and participated with Defendant in the common plan to unlawfully track California residents for Defendant's commercial gain.

**FACTUAL ALLEGATIONS**

10. Defendant is the proprietor of the Website.

11. The Website, like most other websites, due to code or software programs running on the Website, can determine the approximate geolocation of its visitors once the visitors request to visit the Website from their devices. This ability exists separate and apart from the Data Broker software running on the Website that forms the basis of the claim asserted in this action.

12. Defendant has partnered with registered California Data Brokers in order to deanonymize and develop clandestine user profiles on otherwise anonymous website visitors (the "Data Brokers," and each a "Data Broker"). Defendant has done this by installing at least one Data Broker Software Development Kit on the Website.

13. DBSDKs are designed to track and correlate visitors by capturing electronic impulses designed to identify them. This is accomplished through "browser fingerprinting," a process by which Data Brokers are able to ascertain the identity of a website visitor by plotting hundreds of personal identifiers, including a user's geolocation, device information, identification and cross-referencing of malicious cookies installed on their devices, and other traits evident from a user's browser.

### Registered California Data Brokers

14. Data Brokers are companies whose core business is to collect, aggregate, analyze, and sell or license personal and non-personal data about individuals and organizations. Data Brokers operate largely behind the scenes, often without direct interaction with the individuals whose data they monetize.

15. Data Brokers gather information from a wide variety of sources, including by purchasing information from commercial sources like retailers, financial institutions, online marketplaces, subscription services, and loyalty programs.

16. Once the data is collected it is consolidated and organized into comprehensive profiles that may include thousands of attributes per individual. The data is then cross-referenced and linked using unique identifiers like device IDs and cookies to unify data about individual users from multiple sources.

17. Data Brokers are accumulating data and profiling individuals to an alarming extent. As the CEO of a Data Broker recently described the extent of their surveillance abilities as to an otherwise anonymous individual: "We know who she is, what she watches, what she reads, and who she lives with. [We] also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys. We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation."[1]

18. Given the amount of data available by way of the Data Brokers' practices, a company like Defendant has an incentive to partner with a Data Broker so that it can learn the identity of their website visitors in order to harass them with unwanted solicitations.

19. Defendant has in fact partnered with the Data Brokers mentioned herein, by installing software on the Website in order to deanonymize, identify and target prospective customers, while allowing Data Brokers to access, use, and monetize the data provided by Defendant, in manners that are never shared with anyone outside of their organization who does not purchase it.

---

[1] Lucas Ropek, Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users, March 15 2025 (Gizmodo.com).

**Defendant and the California Data Brokers**

20. Defendant's installation and use of DBSDKs violates the California Trap and Trace law.

21. Specifically, Defendant has installed the DBSDKs of Comscore, Inc. (the "Comscore DBSDK") and Quantcast Corporation (the "Quantcast DBSDK") on its Website.

22. Comscore, Inc. ("Comscore") is a data broker that monitors individual users across sites via unique IDs and captures their real-time browsing metadata (IP, pages, timestamps) for analysis.

23. The Comscore DBSDK functions as follows: First, when a user visits a tagged site, the Comscore DBSDK triggers an HTTP request to Comscore's servers. This request transmits identifying signals in real time – including the user's IP address, a timestamp, and browser type.

24. Second, the Comscore DBSDK sets a unique cookie in the user's browser upon first contact, which enables recognizing that browser on subsequent sites. This allows Comscore to "observe 'browser-level' behavior, i.e. how often you return to a website or if, having visited one website, you go to another related one."

25. Third, the Comscore DBSDK intercepts the user's web request and logs it to a third-party server along with persistent identifiers. The data collected (page URLs, titles, visit times, IP, etc.) is used to build user profiles and deduplicate audiences across different websites.  In other words, gathered data is correlated with demographic or personal information in Comscore's panel, which Comscore can then sell.

26. The Comscore DBSDK thus facilitates continuous, cross-site tracking of users via a unique ID tied to their device.

27. The Quantcast DBSDK collects such information as browser type, user agent, unique cookie ID, referrer URL, search terms (from referrer), page URL and timestamps that can be used to match a visitor to other visits to the Website or to other websites that use the Quantcast DBSDK. It uses such captured data to infer a visitor's frequency (in terms of visits), interests and demographics. The Quantcast DBSDK also sets a persistent third-party cookie ("historically __qca") to assign a unique ID for a visit to the Website.

28. The Quantcast DBSDK facilitates invasive ongoing tracking of website visitors. The tracking occurs across a vast network of websites using the persistent cookie ID it sets for a visit/visitor to the Website. This DBSDK uses the data it has collected for its own advertising platform and, on information and belief, in some instances provides insights and information about visitors to websites with third-party advertisers.

29. Visitors to the Website do not meaningfully consent to the above-described identification. The tracking described herein is third-party and occurs by default. Visitors to Defendant's Website are not made aware of, and are not able to disable, this tracking and identification.

**Plaintiff Was Subjected to Trap and Trace Devices on the Website**

30. Plaintiff visited the Website on March 11, 2025. When Plaintiff did so, their identifying information was sent to Data Brokers including Comscore, Inc. ("Comscore") and Quantcast Corporation ("Quantcast") by way of electronic impulses.

31. The purpose of this transfer of data from Defendant to the Data Brokers was for de-anonymization, profiling, targeting and ongoing browsing tracking (as described *supra*). The transfer benefitted Defendant and the Data Brokers financially.

32. On information and belief, the Data Brokers took Plaintiff's information and added

6

the information to its profiles of Plaintiff and of members of the putative class. In turn, Defendant received other relevant data obtained by the Data Brokers regarding Plaintiff. Further, the Data Brokers can use the information regarding Plaintiff's visit to the Website to further profile Plaintiff, with the objective of monetizing this data by selling or licensing it to other entities, including law enforcement and government agencies.

33. The Comscore and Quantcast DBSDKs operating on the Website caused harm or an imminent, material risk of harm to the interest of Plaintiff and members of the putative class in controlling their own personal information. The type of tracking initiated by the DBSDKs on the Website, which involves the amassing of large amounts of data about a user, interferes with the seclusion of individuals, and deprives them of any meaningful opportunity to prevent or control the unauthorized exploitation of their private lives by the Data Brokers.

34. In this regard, a recent report by the Brennan Center, a public policy nonprofit, has explained that "government agencies may purchase personal data to further their exercise of coercive powers, including the ability to deport, arrest, incarcerate, or even use lethal force."[2] There are recent examples of tech companies exchanging information with the federal government in ways that threaten harm to women's freedom, minority viewpoints and marginalized United States citizens or residents. For example, U.S. Immigration and Customs Enforcement (ICE) has partnered with Palantir Technologies, a Denver-based software company, to use artificial intelligence and data mining to identify, track, and deport suspected noncitizens.[3] Another example of such government data exchange is the provision by Meta, pursuant to valid warrants, of user data such as Facebook messages, for the purpose of investigating and prosecuting state

---

[2] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole
[3] https://www.americanimmigrationcouncil.org/blog/ice-immigrationos-palantir-ai-track-immigrants/.

crimes related to abortion.[4]

35. The prospect of private entities such as Data Brokers sharing data they have collected and organized into individualized profiles with government entities has increased significantly in 2025. Columbia and Brown Universities recently agreed to turn over data about applicants and students, such as their race, grades and standardized test scores to the federal government.[5] During this year, tech companies have complied with unprecedented demands for concessions from the federal executive branch.[6] Further, the current federal administration has threatened retaliatory action against pharmaceutical companies that refuse to comply with demands to lower drug prices.[7] No clear legal authority exists preventing the sale or dissemination of user data by Data Brokers to the federal government.

36. The only purpose of the Comscore and Quantcast DBSDKs is to identify users and then track them on the internet.

37. The Comscore DBSDK is a process to identify the source of electronic communication by capturing electronic impulses sent out from Website users' devices and identifying dialing, routing, addressing, and signaling information about or generated by the users. The users are never informed that the Website is collaborating with Comscore to obtain their phone numbers and other identifying information. The Comscore DBSDK is "reasonably likely" to

---

[4] https://www.nbcnews.com/tech/tech-news/facebook-turned-chat-messages-mother-daughter-now-charged-abortion-rcna42185.

[5] *See, e.g.,* Sharon Otterman & Anemona Hartocollis, "Columbia and Brown to Disclose Admissions and Race Data in Trump Deal," (New York Times Aug. 6, 2025), found at https://www.nytimes.com/2025/08/05/nyregion/columbia-brown-admissions-trump.html.

[6] *See, e.g.,* Rob Wile & Allan Smith, "The CEO in chief: How Trump is getting what he wants from big business," (NBCNews.com Aug. 14, 2025), found at https://www.nbcnews.com/business/business-news/what-trump-involvement-major-corporations-means-us-politics-business-rcna224630.

[7] *See, e.g.,* Anna Bratulic, "In latest Trump salvo, pharma giants face 60-day ultimatum on price cuts," (First Word Pharma, July 31, 2025), found at https://firstwordpharma.com/story/5985417.

identify the source of electronic impulses sent from devices visiting the Website. In fact, the Comscore DBSDK is designed solely to meet this objective.

38. The Quantcast DBSDK is aimed at developing a demographic assessment of a website's audience, and to identify its interests. It captures such information as user agent and IP address that can help identify a user across websites and platforms using the Quantcast DBSDK.

39. The Comscore and Quantcast DBSDKs meet the definition of a "trap and trace device" under Cal. Penal Code § 638.50(c) because the Comscore and Quantcast processes capture signaling information (who the visitor is, and what they are doing) in order to identify the source of an otherwise anonymous website visit – which such visit constitutes an electronic communication.

40. There is no way for Plaintiff to learn what the Data Brokers did with Plaintiff's data, including what inferences the Data Brokers have gleaned from it, or when, why and to whom the Data Brokers have sold or licensed Plaintiff's data. As such, Plaintiff has been injured by Defendant's surveillance practices.

41. Plaintiff was never informed of, and therefore could not have consented to, data collection by the Data Brokers for mercantile purposes. Plaintiff has no way to know the scope of the injury suffered because the Data Brokers operate in secret and without public disclosure of their operations.

## The Comscore and Quantcast DBSDKs Are Trap and Trace Devices.

42. CIPA defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing,

addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

43. Each of the Comscore and Quantcast DBSDKs is a process to identify the source of electronic communication by capturing electronic impulses sent out from Website users' devices and identifying dialing, routing, addressing, and signaling information about or generated by the users. The users are never informed that the Website is collaborating with the Data Brokers to obtain the users' identifying information including telephone numbers.

44. Each of the Comscore and Quantcast DBSDKs is "reasonably likely" to identify the source of electronic impulses sent from devices visiting the Website. In fact, these DBSDKs are designed to meet this objective.

45. Defendant did not obtain a court order before installing or using each of the Comscore and Quantcast DBSDKs on its Website.

46. Defendant did not obtain the express or implied consent of Plaintiff to be subjected to data sharing with Comscore and Quantcast for the purposes of de-anonymization, profiling, and targeting.

47. Defendant is statutorily ineligible to assert consent as a defense to its illegal use of a Trap and Trace device. Under Penal Code § 638.51(b), a consent defense is only available to a "provider of electronic or wire communication service," which Defendant is not.

48. The California Invasion of Privacy Act ("CIPA"), California Penal Code § 630 *et seq.*, imposes civil liability and provides for statutory damages for the installation and use of trap and trace software without a court order. *Id.* §§ 637.2, 638.51; *see Moody v. C2* Educ. *Sys. Inc.*, No. 2:24-CV-04249-RGK-SK, 2024 WL 3561367 (C.D. Cal. July 25, 2024) (holding that data broker software was properly alleged to be a trap and trace device because it communicates over

the internet and the statutory definition of a trap and trace device expressly covers "wire communication" and "electronic communication," and is not limited to telephone lines).

## CLASS ALLEGATIONS

49. Plaintiff brings this action individually and on behalf of all others similarly situation (the "Class") defined as follows:

> **All persons within California whose identifying information was sent to California-registered Data Brokers as a result of visiting the Website within the limitations period.**

50. NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

51. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

a. Whether the Comscore and Quantcast DBSDKs are trap and trace processes as defined by California law;

b. Whether Plaintiff and Class Members are entitled to statutory damages;

c. Whether Class Members are entitled to injunctive relief; and

d. Whether Class Members are entitled to disgorgement of unlawfully obtained data.

52. TYPICALITY: As a person who visited Defendant's Website and whose personal information was fingerprinted and de-anonymized by use of the Comscore and Quantcast DBSDKs, Plaintiff is asserting claims that are typical of the Class.

53. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

54. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class Member is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

**FIRST CAUSE OF ACTION**

Violations of California Trap and Trace Law

**Cal. Penal Code § 638.51 (the "California Trap and Trace Law")**

55. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

56. The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

57. A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." *Id.* § 638.50(c).

58. Each of the Comscore and Quantcast DBSDKs, as deployed on the Website, constitutes a trap and trace device under Cal. Penal Code § 638.50(c). Each of the Comscore and

Quantcast DBSDKs is designed to identify the source of the electronic and wire communications sent from the devices of users in California visiting the Website in violation of the California Trap and Trace Law.

59. Defendant did not obtain a court order before using or installing each of the Comscore and Quantcast DBSDKs on the Website. Defendant also did not obtain consent from Plaintiff or any of the Class Members before using trap and trace technology, including the Comscore and Quantcast DBSDKs, to identify visitors to its Website.

60. CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2; *see also C2 Educ. Sys. Inc.*, 2024 WL 3561367.

## **PRAYER**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel;

2. An order that data unlawfully obtained by Defendant's deployment of a trap and trace device be disgorged;

3. An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

4. Statutory damages pursuant to CIPA;

5. Reasonable attorneys' fees and costs; and

6. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

DATED: December 8, 2025　　　　　　　　TAULER SMITH LLP

　　　　　　　　　　　　　　　　　　　　By:　*/s/ J. Evan Shapiro*
　　　　　　　　　　　　　　　　　　　　　　　J. Evan Shapiro, Esq.

　　　　　　　　　　　　　　　　　　　　J. Evan Shapiro
　　　　　　　　　　　　　　　　　　　　Robert Tauler
　　　　　　　　　　　　　　　　　　　　90 Broad St., Suite 703
　　　　　　　　　　　　　　　　　　　　New York, New York 10004
　　　　　　　　　　　　　　　　　　　　eshapiro@taulersmith.com
　　　　　　　　　　　　　　　　　　　　rtauler@taulersmith.com
　　　　　　　　　　　　　　　　　　　　(212) 702-8670 (New York office)
　　　　　　　　　　　　　　　　　　　　(213) 927-9270 (Main Office (L.A.))

　　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff Jane Heiting*

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED: December 8, 2025                    TAULER SMITH LLP

                                           By:   */s/ J. Evan Shapiro*
                                                 J. Evan Shapiro

                                           J. Evan Shapiro
                                           Robert Tauler
                                           90 Broad St., Suite 703
                                           New York, New York 10004
                                           eshapiro@taulersmith.com
                                           rtauler@taulersmith.com
                                           (212) 702-8670 (New York office)
                                           (213) 927-9270 (Main Office (L.A.))

                                           *Attorneys for Plaintiff Jane Heiting*