**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JANE HEITING, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>vs.<br><br>KORANGY PUBLISHING INC., a New York corporation; and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No. 1:25-cv-10176-MKV<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR: (1) USE OF A TRAP AND TRACE DEVICE IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CAL. PENAL CODE § 638.51); (2) INTRUSION UPON SECLUSION** |

## INTRODUCTION

1. Plaintiff, on her behalf and on behalf of a class of similarly situated persons brings this action against Defendant KORANGY PUBLISHING INC. ("Defendant" or "Korangy"). Korangy operates a publication about the real estate industry, and significant real estate transactions, in the United States entitled, The Real Deal. The Real Deal is published online at https://therealdeal.com/ (the "Website"). Defendant uses the Website to provide news to individuals and entities in the real estate space and to obtain subscriptions to The Real Deal.

2. Defendant has installed and deployed data broker and advertising platform software on the Website to secretly collect data about visitors to the Website, their devices, locations and views of webpages. The purpose of this collection is to identify who the visitors are, target them with unwanted marketing and track their internet browsing on an ongoing basis.

3. The data broker and advertising platform software compiles the collected data and correlates it with extensive external records it already has about most Californians in order to learn the identity of Website visitors.

4. Both Defendant and the third-party data collectors behind the software involved

benefit commercially and financially from this activity. They benefit because collected visitor data, and the identification of visitors using that data, are used to, among other things, target Website visitors for specific marketing. Related to the inclusion of the advertising platform code on the Website, Defendant runs a substantial number of marketing campaigns on the Meta social media/advertising platforms Facebook and Instagram, and on Google Search.

5. Defendant's installation and use of data broker and advertising platform software without obtaining consent or authorization violated California's Trap and Trace Law, California Penal Code § 638.51.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

7. This Court has general jurisdiction over Defendant Korangy because it is a New York corporation with its headquarters located in New York, New York.

8. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because Defendant resides in the District, where its headquarters are located.

## PARTIES

9. Plaintiff Jane Heiting ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of California residing and located within the Central District of California. Plaintiff maintains reasonable expectations of privacy when browsing websites. Defendant systematically violated these expectations through its unauthorized surveillance activities.

10. Defendant Korangy owns and operates https://therealdeal.com/ (the "Website"). The Website offers to the public news, market intelligence, data, and analysis on commercial and residential real estate concerning major US metropolitan areas including New York City, Los Angeles, Chicago, San Francisco and South Florida.

11. Plaintiff identifies DOE Defendants 1 through 15 as unknown entities that Defendant directed and controlled to participate in implementing or maintaining Defendant's system. Plaintiff will seek leave to amend this Complaint to identify these entities when Defendant's discovery responses reveal their true names and roles.

12. Each DOE Defendant acted as Defendant's agent or employee in Defendant's implementation of the surveillance scheme described herein. Each DOE Defendant operated within the scope of its relationship with Defendant and participated with Defendant in the common plan to unlawfully track California residents for Defendant's commercial gain.

## FACTUAL ALLEGATIONS

13. Defendant owns and operates the Website, providing news about the real estate industry and significant real estate transactions in the United States, and selling subscriptions to Defendant's publication, The Real Deal.

14. Defendant runs campaigns for The Real Deal on social media/advertising platforms operated by Meta and Google. Appended hereto as **Exhibit A** is a PDF made of the results of a search conducted on June 4, 2026 of campaigns appearing on Meta platforms Facebook and Instagram. Appended hereto as **Exhibit B** is a PDF made of the results of a search conducted on June 4, 2026 of campaigns appearing on Google Search. These campaigns appear on the "feeds" of users of Facebook, Instagram and Google Search.

15. Defendant has partnered with data brokers registered with the state of California (the "Data Brokers," and each a "Data Broker"), and with Meta and Google, in order to deanonymize and develop clandestine profiles on otherwise anonymous visitors to the Website. Defendant has done this for its financial and commercial benefit by installing software belonging to these entities on the Website, and allowing it to operate thereon.

16. On March 11, 2025, Plaintiff visited the Website from a location in California. When she did, data that reasonably likely identified her were transmitted to at least two (2) Data Brokers who used and profited that data, along with Defendant: Comscore, Inc. ("Comscore") and Quantcast Corporation ("Quantcast"). Data that similarly reasonably likely identified her were transmitted to Meta and Google.

17. The Comscore, Quantcast, Meta and Google code deployed on the Website is designed to track and correlate visitors by capturing electronic impulses transmitted from the devices of visitors to a website on which it is deployed. The process initiated by the Comscore, Quantcast, Meta and Google code identifies visitors through "browser fingerprinting." Fingerprinting allows data brokers like Comscore and Quantcast to ascertain the identity of a website visitor by plotting hundreds of personal identifiers, including a user's geolocation, device information, identification and cross-referencing of malicious cookies installed on their devices, and other traits evident from a user's browser.

**Browser Fingerprinting**

18. Why does it matter that data about a Website visitor such as the size of her screen, her device's brand name and her browser settings get transmitted to Comscore and Quantcast? One would think that the sharing of such seemingly non-personal data cannot impact a visitor's life or experience. This assumption is simply incorrect.

19. The fact is that when you visit a website, ***and before you get to weigh in on whether you should be targeted with ads or identified***, hundreds of non-personal data points tell those data brokers who you are, or at the very least stop this relatively brief process. (These data points are *usually* accompanied with information such as the webpage you viewed just prior to arrival, and geolocation data.) Data Brokers may already have access to your name and email addresses, as well as other websites you have visited in the past, to combine and/or match with this incoming data from your device.

20. Examples of such data points are:

- Device type and configuration
- Browser type and version
- Operating system and version
- Screen resolution and color depth
- System language settings
- Time zone settings
- Installed fonts
- Installed browser plugins or extensions
- Device memory
- CPU class
- Canvas rendering characteristics
- WebGL rendering characteristics
- AudioContext processing characteristics
- Touch support and input capabilities
- Network connection type

21. To be clear, ***website operators*** require some of the data points at issue to render the contents of a page on a website on their visitors' devices. For example, a webpage will only load appear properly to a visitor with information about a visitor's device characteristics and configurations, including screen size. What is being discussed here – and what is at issue in this action – is the provision of such data ***to third parties not involved in operation of the website itself***, or the rendering of the website's contents on visitors' screens. The data brokers do not need the data to operate any website, or for any purpose other than to identify, target and track the visitors.

22. As explained in an article in the October 2025 issue of *Wired Magazine*:

> Your browser fingerprint is a collection of innocuous information about your PC that, ***when put together, is unique enough that it could identify an individual***. Some of the components of your browser fingerprint include your computer's hardware, your browser and version, the various versions of software you have running in your browser, the fonts you have installed on your PC, your time zone, your system language, your keyboard layout; the list goes on. Out of the dozens of pieces of information, none of them could identify you individually. It's when this data is bundled together that your fingerprint becomes unique.[1]

---

[1] Jacob Roach, "Here's What Your Browser Is Telling Everyone About You: Your browser sends a lot of information with each website you visit. That can be used to track you across the internet." (Wired Magazine, Oct. 16, 2025), available at https://www.wired.com/story/what-is-browser-fingerprinting/ (last viewed 2/22/2026).

23. The fingerprinting process works even when a visitor does not enter any items *colloquially referred to* as "personal data" – such as name, telephone number, address or email address – into a website.[2]

24. In 2025, researchers at U.S. universities found evidence of the use of browser fingerprinting by websites, particularly in connection with advertising.[3] Through research, Dr. Yinzhi Cao, Associate Professor of Computer Science and Technical Director of the Information Security Institute at Johns Hopkins University, and other scholars, have "correlate[d] browser fingerprints and ad behaviors, essentially establishing the relationship between web tracking and fingerprinting."[4]

25. As California Attorney General Rob Bonta explained in a 2022 California Superior Court complaint filed against retailer/website operator Sephora USA, Inc.:

> Consumers are constantly tracked when they go online. Sephora, like many online retailers, allows third-party companies to install tracking software on its website and in its app so that these third parties can monitor consumers as they shop. The third parties track all types of data; in Sephora's case, third parties can track whether a consumer is using a MacBook or a Dell, the brand of eyeliner that a consumer puts in their "shopping cart," and even the precise location

---

[2] As discussed *infra*, in the privacy context, "personal information" can be used to refer to any information that can assist in identifying a person.

[3] Texas A&M Univ. Dep't of Computer Science and Engineering, "Websites Are Tracking You Via Browser Fingerprinting: New research provides the first evidence of the use of browser fingerprints for online tracking." (Texas A&M Stories June 26, 2025), available at https://stories.tamu.edu/news/2025/06/26/websites-are-tracking-you-via-browser-fingerprinting/ (last viewed 2/22/2026).

[4] *Id.*

> of the consumer. Some of these third-party companies create entire profiles of users who visit Sephora's website, which the third parties then use for Sephora's benefit. For example, the third party might provide detailed analytics information about Sephora's customers and provide that to Sephora, or offer Sephora the opportunity to purchase online ads targeting specific consumers [ . . . ]. This data about consumers is frequently kept by companies and used for the benefit of other businesses, without the knowledge or consent of the consumer.

Complaint, *People of the State of California v. Sephora USA, Inc.*, CGC-22-601380, 2022 CA Sup. Ct. Pleadings LEXIS 38450 (Cal. Super. Ct., San Francisco Co., Aug. 24, 2022) (the "*Sephora* Complaint"), at 2:2-13.

**The Cycle of Third-Party Collection of Consumer Data and the Tracking of Consumers**

26. Collection of visitor data by entities such as Comscore and Quantcast – including collection by these entities of unique identifiers that the Comscore and Quantcast code assigns to visitors to the websites of advertising companies like Defendant – enables ongoing tracking of website visitors as they visit new websites in the future. At the same time, the tracking of a person's internet browsing going forward provides more opportunities for data collection (and profile building) about an individual. This cycle aids the advertising and/or data monetization efforts of Comscore, Quantcast and similar organizations.

**Registered California Data Brokers**

27. Data Brokers are companies whose core business is to collect, aggregate, analyze, and sell or license personal and non-personal data about individuals and organizations. Data Brokers operate largely behind the scenes, often without direct interaction with the individuals whose data they monetize.

28. Data Brokers gather information from a wide variety of sources, including by purchasing information from commercial sources like retailers, financial institutions, online marketplaces, subscription services, and loyalty programs.

29. Once the data is collected it is consolidated and organized into comprehensive profiles that may include thousands of attributes per individual. The data is then cross-referenced and linked using unique identifiers like device IDs and cookies to unify data about individual users from multiple sources.

30. Data Brokers are accumulating data and profiling individuals to an alarming extent. As the CEO of a Data Broker recently described the extent of their surveillance abilities as to an otherwise anonymous individual: "We know who she is, what she watches, what she reads, and who she lives with. [We] also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys. We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation."[5]

[5] Lucas Ropek, Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users, March 15 2025 (Gizmodo.com).

31. For decades, data brokers have collected personal information to sell at a profit.[6] An FTC investigation revealed that one data broker "has information on 6.2 billion consumer transactions" and another has "5888 data segments for nearly every U.S. consumer."[7] This may include information about consumers' race, sexual orientation, immigration status, or religious affiliation.[8] Data brokers "deanonymize" this data, which allows them to create detailed profiles on specific individuals.[9]

32. Given the amount of data available by way of the Data Brokers' practices, a company like Defendant has an incentive to partner with Data Brokers so that it can learn the identity of their website visitors in order to target them with specific marketing materials – even if the visitors do not wish to receive them.

33. Here, Defendant partnered with Comscore, Quantcast and possibly others, by installing Comscore and Quantcast code onto the Website. Defendant allows Comscore and Quantcast, and possibly other Data Brokers, to access, use, and monetize the data provided by Defendant, in ways that remain undisclosed to the public. Defendant also partnered with Meta and Google to access, use, and monetize the visitor data provided by Defendant, in ways that remain undisclosed to the public.

---

[6] FTC, Data Brokers: A Call for Transparency and Accountability (May 2014), at 4, available at https://perma.cc/A6ZYWY3P (last viewed 5/3/2026).

[7] *Id.*, at 46-47.

[8] *Id.*, at 19-21; CFPB, Protecting Americans From Harmful Data Broker Practices (Dec. 13, 2024), 89 Fed. Reg. 101402, 10404-05, available at https://perma.cc/UX85-RMFA (last viewed 5/3/2026).

[9] *Id.*, 89 Fed.Reg. at 101420-21.

**Comscore Code**

34. Comscore, Inc. ("Comscore") is a data broker that monitors individual users across sites via unique IDs and captures their real-time browsing metadata (IP, pages, timestamps) for analysis.

35. The Comscore code functions as follows: First, when a user visits a tagged site, the Comscore code triggers an HTTP request to Comscore's servers. This request transmits identifying signals in real time – including the user's IP address, a timestamp, and browser type.

36. Second, the Comscore code sets a unique cookie in the user's browser upon first contact, which enables recognizing that browser on subsequent sites. This allows Comscore to "observe 'browser-level' behavior, i.e. how often you return to a website or if, having visited one website, you go to another related one."

37. Third, the Comscore code intercepts the user's web request and logs it to a third-party server along with persistent identifiers. The data collected (page URLs, titles, visit times, IP, etc.) is used to build user profiles and deduplicate audiences across different websites. In other words, gathered data is correlated with demographic or personal information in Comscore's panel, which Comscore can then sell.

38. The Comscore code thus facilitates continuous, cross-site tracking of users via a unique ID tied to their device.

39. Plaintiff was subjected to the Comscore code as described *supra* starting when she requested that the Website load on her device on March 11, 2025.

**Quantcast Code**

40. Quantcast is an analytics and digital advertising company known for its "Quantcast Measure" audience measurement service and its programmatic advertising platform. It has long provided free web analytics to publishers in exchange for the ability to collect data on those publishers' visitors, which Quantcast then uses to infer demographics and interests. Quantcast started as an online ratings service (like Nielsen for the web), placing tracking pixels on many websites to gauge traffic and user characteristics.

41. Quantcast is embedded on a large number of websites – historically, any site that wanted to understand its audience might include the Quantcast tag. This means a single user could be tracked via Quantcast across news sites, blogs, e-commerce, etc., similar to how Google Analytics or Facebook pixels track users. Unlike Google, which might limit use of data for only the site owner's purposes, Quantcast explicitly uses the data for its own and third-party advertising purposes.

42. The Quantcast code collects such information as browser type, user agent, unique cookie ID, referrer URL, search terms (from referrer), page URL and timestamps that can be used to match a visitor to other visits to the Website or to other websites that use the Quantcast code. It uses such captured data to infer a visitor's frequency (in terms of visits), interests and demographics. The Quantcast code also sets a persistent third-party cookie ("historically __qca") to assign a unique ID for a visit to the Website.

43. The Quantcast code facilitates invasive ongoing tracking of website visitors. The tracking occurs across a vast network of websites using the persistent cookie ID it sets for a visit/visitor to the Website. The code uses the data it has collected for its own advertising platform

and, on information and belief, in some instances provides insights and information about visitors to websites with third-party advertisers.

44. Plaintiff was subjected to the Quantcast code as described *supra* starting when she requested that the Website load on her device on March 11, 2025.

**Troubling Implications of Third-Party Data Sharing**

45. Companies using third-party tracking software – such as the Comscore, Quantcast, Google and Meta code described above – often seek to downplay its significance. They emphasize that the data collected by such software is being used simply to inform consumers about products they believe would be particularly appealing to them. However, there is no guarantee that consumer data supplied to data brokers or social media platforms will be used solely for advertising purposes.

46. As Attorney General Bonta explained in the *Sephora* case:

> The ramifications of this third-party surveillance can go beyond ordinary consumer profiling. Sephora's website allows visitors to browse and purchase products such as prenatal and menopause support vitamins—data points which can be used by third-party companies to infer conclusions about women's health conditions, like pregnancy. Moreover, when a company like Sephora utilizes third-party tracking technology without alerting consumers and giving them the opportunity to control their data, they deprive consumers of the ability to limit the proliferation of their data on the web.

*Sephora* Complaint, at 2:14-20.

47. As Data Brokers, Comscore and Quantcast can use data they it received regarding Plaintiff's visit to the Website to further profile Plaintiff, with the objective of monetizing the data by selling or licensing it to other entities, including law enforcement and government agencies. The same can be said of data they received regarding visits of members of the putative Class in this action.

48. A recent report by the Brennan Center, a public policy nonprofit, has explained that "government agencies may purchase personal data to further their exercise of coercive powers, including the ability to deport, arrest, incarcerate, or even use lethal force."[10]

49. There are recent examples of tech companies exchanging information with the federal government in ways that threaten civil liberties and individuals with minority viewpoints. For example, U.S. Immigration and Customs Enforcement (ICE) has partnered with Palantir Technologies, a Denver-based software company, to use artificial intelligence and data mining to identify, track, and deport suspected noncitizens.[11]

50. In February 2026, Google handed over user data to the United States Department of Homeland Security ("DHS" or "Homeland Security") based on an administrative subpoena for the investigation of an individual based on the fact that he had written to a DHS attorney advocating on behalf of a refugee from Afghanistan in deportation proceedings.[12] No clear legal authority exists preventing the sale or dissemination of user data by Data Brokers to the federal government.

---

[10] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole

[11] https://www.americanimmigrationcouncil.org/blog/ice-immigrationos-palantir-ai-track-immigrants/ (last visited 2/6/2026).

[12] https://newrepublic.com/post/206088/homeland-security-67-year-old-us-citizen-criticized-email (last visited 2/8/2026).

51. The New York Times reported on February 13, 2026, "Homeland Security is said to have sent Google and Meta hundreds of subpoenas for information to identify Americans who oppose ICE. Tech companies received legal requests for the names, email addresses, telephone numbers and other identifying data behind social media accounts that track or criticize the agency."[13]

52. In early March 2026, a news website reported about the existence of an U.S. Department of Homeland Security internal document revealing that Custom and Border Protection ("CPB") "bought data from the online advertising ecosystem to track peoples' precise movements over time …"[14]

**Data and Related Profiles of Consumers Have Economic Value**

53. The type of visitor data transmitted via the Website to Comscore and Quantcast have economic value – as it obvious from the facts that these third parties create code to collect it, and that Defendant has installed the code on the Website. The value of this data – that of Plaintiff as well as that of members of the Class on whose behalf Plaintiff has filed this action – was diminished by Defendant's deployment of the Comscore and Quantcast code on the Website.

54. The loss of anonymity that occurs through the type of visitor browser fingerprinting and subsequent tracking alleged herein imposes real costs on visitors to Defendant's Website,

[13] *Homeland Security Wants Social Media Sites to Expose Anti-ICE Accounts* (N.Y. Times Feb. 13, 2026), available at https://www.nytimes.com/2026/02/13/technology/dhs-anti-ice-social-media.html (last visited 2/25/2026).

[14] *CBP Tapped Into the Online Advertising Ecosystem To Track Peoples' Movements* (404 Media Mar. 3, 2026), available at https://www.404media.co/cbp-tapped-into-the-online-advertising-ecosystem-to-track-peoples-movements/ (last visited 3/16/2026); *see also Security News This Week: CBP Used Online Ad Data to Track Phone Locations* (Wired Mar. 7, 2026), available at https://www.wired.com/story/cbp-used-online-ad-data-to-track-phone-locations/ (last visited 3/16/20260.

including Plaintiff and members of the putative Class in this action. For example, in 2025, the Federal Trade Commission found that many websites use data such as "consumers' characteristics and behaviors, like location, demographics, browsing patterns and shopping history" to tailor consumer pricing.[15]

55. As recently explained by the Law Institute:[16]

> In the modern economy, identity information has been described as the business of buying and selling information as a commodity. Unlike traditional physical commodities, personal data is intangible yet holds immense economic value. The transformation of identity into a tradeable asset has occurred gradually as technologies for collecting and analyzing personal information have become increasingly sophisticated. [ . . . ] Personal identity in the digital realm comprises multiple elements. Demographic information includes age, gender, location, income levels, and educational background. Behavioral data tracks online activities such as websites visited, products viewed, and time spent on particular pages. Transaction histories reveal purchasing patterns, payment methods, and brand preferences. Location data from smartphones and wearable devices provides real-time information about movements and habits. What makes identity information

---

[15] *See* https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-surveillance-pricing-study-indicates-wide-range-personal-data-used-set-individualized-consumer (U.S. Federal Trade Commission Jan. 17, 2025) (last visited 2/23/2026).

[16] https://thelaw.institute/cyberspace-technology-and-social-issues/identity-value-modern-economy/ (The Law Institute (Updated) Oct. 27, 2025) (last visited 2/23/2026).

> particularly valuable is its predictive power. By analyzing past behaviors and preferences, companies can anticipate future actions with remarkable accuracy. This ability to forecast consumer behavior translates directly into competitive advantages in marketing and product development. A complex ecosystem has emerged around the collection and trading of identity information. This marketplace operates largely invisibly to average consumers, yet it powers much of the modern digital economy. The global data brokerage industry was valued at approximately $270.4 billion in 2024, with projections indicating growth to $473.35 billion by 2032. [ . . . ] Advertisers and marketers purchase identity information to target specific consumer segments with tailored messages. Behavioral advertising uses internet cookies and tracking technologies to understand browsing tendencies and create defined audience segments. This allows companies to place advertisements in front of consumers most likely to respond positively.

56. There exists an established market for the type of personal data collected and transmitted through the Comscore and Quantcast code running on the Website: data that facilitates the creation and enhancement of consumer profiles for individuals, and ongoing tracking of individuals' internet browsing. Defendant's surreptitious and unlawful transfer of personal information through the code on its Website diminished Plaintiff's and Class members' ability to participate in that market on informed terms, including to exercise the choice of whether to withhold, limit, or exchange their personal data for value.

## CLASS ALLEGATIONS

57. Plaintiff brings this action individually and on behalf of all others similarly situation (the "Class") defined as follows:

> All persons who, while located in California, visited the Website during the applicable limitations period, and were subjected to the operation of one or more of the Comscore, Quantcast, Google or Meta code running on the Website.

58. NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

59. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

a. Whether Defendant's actions violate California common or statutory law;

b. Whether Plaintiff and Class Members are entitled to statutory damages;

c. Whether Class Members are entitled to injunctive relief; and

d. Whether Class Members are entitled to disgorgement of unlawfully obtained data.

60. TYPICALITY: Plaintiff was subjected to the Comscore, Quantcast, Google and Meta code running on the Website when she visited the Website on March 11, 2025. As a result,

her data was transmitted to Comscore, Quantcast, Google and Meta, and possibly other third parties, for fingerprinting and tracking purposes. Her claims are therefore typical of the Class.

61. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

62. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class Member is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

## FIRST CAUSE OF ACTION

### Violations of California Trap and Trace Law

### Cal. Penal Code § 638.51 (the "California Trap and Trace Law")

63. Plaintiff and Class members reallege and incorporate each allegation in all preceding paragraphs as if fully set forth herein.

64. The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

65. A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." *Id.* § 638.50(c).

66. The Comscore, Quantcast, Google and Meta code, as deployed on the Website, constitutes a trap and trace device under Cal. Penal Code § 638.50(c).

67. The "wire or electronic communication" at issue in this case is the communication between the devices of Plaintiff and the Class members, on the one hand, and the Website, an instrumentality of Defendant, on the other hand. "Electronic communication" is defined under CIPA as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system." Cal. Penal Code § 629.51(a)(2).[17] A visit to a website entails the transfer of signals and data, or "intelligence of any nature" by a "wire, radio [or] electromagnetic [ . . . ] system." Cal. Penal Code § 629.51(a)(2). The interactions of Plaintiff and Class members with the Website meet this definition.

68. The Comscore, Quantcast, Google and Meta code is designed to identify *to a reasonably likely degree* the source of the wire or electronic communications between the devices of Plaintiff and Class members, on the one hand, and the Website, on the other, by 'capturing' the electronic or other impulses emanating from the devices that are "incoming" to the Website and/or the third-party data collectors. The '***sources***' of the wire or electronic communications moving from the devices to the Website are Plaintiff and the Class members (including their devices and browsers).

69. A majority of California courts, both state and federal, have found that software or code running on websites that "captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely

[17] This provision is not included within CIPA, but rather incorporated into CIPA for purposes of the application of certain CIPA provisions.

to identify the source of a wire or electronic communication" constitutes a trap and trace device under §§ 638.50-51. *See, e.g., Nelson v. Reddit, Inc.*, 2026 U.S. Dist. LEXIS 32134, at *7-10 (S.D. Cal. Feb. 17, 2026); *Alex & Ani, LLC*, 2026 U.S. Dist. LEXIS 11238, at *4-7 (C.D. Cal. Jan. 20, 2026); *Casillas v. Six Flags Ent. Corp.*, 2025 U.S. Dist. LEXIS 260100, at *21-22 (C.D. Cal. Dec. 15, 2025); *Lewis v. Magnite, Inc.*, 2025 U.S. Dist. LEXIS 263675, at *39-42 (C.D. Cal. Dec. 4, 2025); *Camplisson v. Adidas Am., Inc.*, 809 F.Supp.3d 1095, 1107 (S.D. Cal. Nov. 18, 2025); *Santoro v. Lulu*, 2025 Cal. Super. LEXIS 84529 (L.A. Super. Ct. Nov. 11, 2025); *Garon v. Keleops USA, Inc.*, 2025 U.S. Dist. LEXIS 170745, at *10-15 (N.D. Cal. Sep. 2, 2025); *Valenzuela v. Intersystems Corp.*, 2025 Cal. Super. LEXIS 42550, at *3-4 (Orange Co. Superior Ct. Aug. 4, 2025); *Riganian v. LiveRamp Holdings, Inc.*, 791 F.Supp.3d 1075, 1093-1094 (N.D. Cal. July 18, 2025); *Gabrielli v. Motorola Mobility LLC*, 2025 U.S. Dist. LEXIS 133836, at *30-32 (N.D. Cal. July 14, 2025); *Price v. Headspace, Inc.*, 2025 Cal. Super. LEXIS 27951, at *3-9 (L.A. Super Ct. Apr. 1, 2025); *Sanchez v. Glasscanopy, Inc.*, 2025 Cal. Super. LEXIS 18460, at *8-9 (L.A. Super. Ct. Feb. 28, 2025); *Heiting v. Fka Distrib. Co.*, 2025 U.S. Dist. LEXIS 20076, at *8 (C.D. Cal. Feb. 3, 2025); *Conohan v. Rad* Power *Bikes Inc.*, 2025 U.S. Dist. LEXIS 72865, 2025 WL 1111246, at *16 (C.D. Cal. Apr. 3, 2025); *Rodriguez v. Autotrader.com, Inc.*, 762 F.Supp.3d 921, 929-930 (C.D. Cal. 2025); *Lesh v. Cable News Network, Inc.*, 767 F.Supp.3d 33, 40-42 (S.D.N.Y. 2025); *Mirmalek v. Los Angeles Times Commc'ns LLC*, 2024 U.S. Dist. LEXIS 227378, at *6-10 (N.D. Cal. Dec. 12, 2024); *Carreiro v. Ehm Productions, Inc.*, 2024 Cal. Super. LEXIS 60888, at *5-6 (L.A. Super. Ct. Dec. 11, 2024); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 930-931 (N.D. Cal. October 21, 2024); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076-1077 (C.D. Cal. July 25, 2024); *Greenley v. Kochava, Inc.* 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023).

70. Defendant did not obtain a court order before using or installing the Comscore, Quantcast, Google and Meta code on the Website. Defendant also did not obtain consent from Plaintiff or any of the Class Members before using this technology, which is designed to reasonably likely identify Plaintiff and the Class members, along with their devices, as the source of electronic communications between them, on the one hand, and the Website, an instrumentality of Defendant, on the other hand.

71. Defendant did not obtain the express or implied consent of Plaintiff or Class members to be subjected to data-sharing or data-selling with or by or through Comscore, Quantcast, Google and Meta code.

72. Defendant is ineligible for the statutory consent exemption from liability for use of a trap and trace device set forth in Cal. Penal Code § 638.51(b)(5). The § 638.51(b)(5) consent exemption is available only to a "provider of electronic or wire communication service." Defendant is not such a provider.

73. Defendant's unlawful surveillance directly caused Plaintiff and Class members significant injuries. These injuries include: Defendant's invasion of their legally protected privacy rights; their loss of control over personal identifying information due to Defendant's actions; the diminution in value of their data and identity to Plaintiff and the Class members; Defendant's unauthorized creation of detailed behavioral profiles of them; mental anguish from knowledge of Defendant's secret monitoring; and chilling effects on their free online expression and inquiry due to Defendant's conduct.

74. CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2; *see also Fandom,* 754 F. Supp. 3d at 932; *C2 Educ. Sys. Inc.*, 742 F. Supp. 3d at 1077-78.

75. Plaintiff and Class members are entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51.

**SECOND CAUSE OF ACTION**

**Inclusion Upon Seclusion**

76. Plaintiff and Class members reallege and incorporate each allegation in all preceding paragraphs as if fully set forth herein.

77. Under California law, a defendant is liable for intrusion upon seclusion when it intentionally intrudes into a private place, conversation, or matter in a manner that would be highly offensive to a reasonable person.

78. Defendant's deployment of Comscore, Quantcast, Google and Meta code on the Website intentionally intruded into a private conversation or matter Plaintiff and the Class members were involved in – namely their visit to the Website. The intrusion allowed Comscore, Quantcast, Google and Meta to identify, profile and track (on an ongoing basis) Plaintiff and Class members. Deployment of tracking software that engages in the type of identification, profiling and tracking carried out by Comscore, Quantcast, Google and Meta code that Defendant installed on the Website forms the basis of an actionable intrusion upon seclusion claim under California law. *See, e.g., Caldwell v. InMobi Pte., Ltd.*, No. 25-cv-09977-AMO, 2026 LX 229530, at *7-14 (N.D. Cal. Apr. 29, 2026); *Casillas v. Six Flags Ent. Corp.*, 812 F. Supp. 3d 1016, 1029-30 (C.D. Cal. 2025); *Krzyzek v. Openx Techs., Inc.*, No. 25-cv-05588-SI, 2026 LX 42961, at *10-13 (N.D. Cal. Jan. 27, 2026).

79. Plaintiff and the Class members never authorized the third-party cookies and other tracking technology initiated by the Comscore, Quantcast, Google and Meta code on the Website.

80. Plaintiff and Class members had an objectively reasonable expectation of privacy with respect to their conversation or exchange with Defendant over the Website. They did not expect that their visits to the Website would result in being identified and tracked on an ongoing basis and on other websites by Comscore, Quantcast, Google and Meta because Defendant installed their code on the Website.

81. Defendant's intrusion into Plaintiff's and Class members' visits to the Website was intentional, in that it involved deployment of software and configuration of the Website. Further, it was perpetrated for Defendant's economic benefit.

82. The intrusion described herein would be highly offensive to a reasonable person because it involves identification of individuals visiting the Website that facilitates ongoing tracking of them on different websites on the internet unrelated to their visits to the Website.

83. As the result of Defendant's intrusion upon seclusion, Plaintiff and Class members suffered the same injuries identified with respect to the First Cause of Action *supra*.

84. Defendant's invasion of the privacy of Plaintiff and Class members damaged them and they are there entitled to compensatory damages, which includes monetary damages.

85. Plaintiff and Class members are entitled additionally to punitive damages because Defendant's use of the Comscore, Quantcast, Google and Meta code on the Website was malicious, oppressive and willful.

86. Plaintiff and Class members are entitled additionally to equitable relief in the form of enjoining Defendant from continuing to engage in its unlawful conduct, and disgorgement of profits earned by Defendant from its invasion of their privacy interests.

**PRAYER**

WHEREFORE, Plaintiff, on her behalf and on behalf of the Class members, prays for the following relief against Defendant:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel;

2. An order that data unlawfully obtained by Defendant's deployment of a trap and trace device be disgorged;

3. An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

4. Statutory damages pursuant to CIPA;

5. Reasonable attorneys' fees and costs; and

6. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

DATED: June 4, 2026

TAULER SMITH LLP

By: *<u>/s/ J. Evan Shapiro</u>*
J. Evan Shapiro, Esq.

J. Evan Shapiro
Robert Tauler
90 Broad St., Suite 703
New York, New York 10004
eshapiro@taulersmith.com
rtauler@taulersmith.com
(212) 702-8670 (New York office)
(213) 927-9270 (Main Office (L.A.))

*Attorneys for Plaintiff Jane Heiting*

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED: June 4, 2026

TAULER SMITH LLP

By: *<u>/s/ J. Evan Shapiro</u>*
J. Evan Shapiro

J. Evan Shapiro
Robert Tauler
90 Broad St., Suite 703
New York, New York 10004
eshapiro@taulersmith.com
rtauler@taulersmith.com
(212) 702-8670 (New York office)
(213) 927-9270 (Main Office (L.A.))

*Attorneys for Plaintiff Jane Heiting*